## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Patricia Dawn Welch Day,

                Plaintiff,

v.

Derek Chauvin, acting in his individual
capacity as a Minneapolis Police Officer;
Ellen Jensen, acting in her individual
capacity as a Minneapolis Police Officer; and
the City of Minneapolis,

                Defendants.

_____

**COMPLAINT**
**Jury Trial Demanded**
**Under FRCP 38(b)**

For her Complaint, Plaintiff Patricia Dawn Welch Day ("Patty") states and alleges as follows:

### INTRODUCTION

1.     This is an action for money damages for injuries sustained by Patty as a result of the gratuitous use of excessive force by then-Minneapolis Police Department (MPD) officer Derek Chauvin and his former partner, MPD officer Ellen Jensen, on January 17, 2020.

2.     On the day in question, Chauvin and Jensen violently yanked Patty from her vehicle and, without justification, threw her to the ground in the middle of a street, fracturing her tooth, injuring her arm and shoulder, and causing other significant injuries before handcuffing her.  Chauvin then assumed his signature pose, pressing his knee into

the subdued and handcuffed Patty's back—just as he would later do to snuff the life out of George Floyd—and remaining that way well after Patty was controlled.

3.      For Chauvin, such misconduct was par for the course.  He was a long-troubled officer with a documented pattern of misconduct, to which MPD and City leaders willfully turned a blind eye.

4.      Chauvin actively sought to prey on helpless and vulnerable arrestees, including Zoya Code, John Pope, and George Floyd, among others.  Patty was one of many unfortunate victims of Chauvin's unchecked use of excessive force.

5.      Substantial evidence of Chauvin's misconduct was recorded by MPD-issued body-worn cameras (BWCs) and stored in MPD's and the City's paid-for evidence repository, Evidence.com.

6.      The video evidence was available for MPD supervisors and policymakers to see, if anyone had cared enough to look.  But MPD command and control personnel ignored this evidence or, worse, reviewed it and did nothing, in either case continuing to condone such actions by Chauvin and other officers.

7.      Moreover, per MPD's longstanding customs and practices, Jensen not only participated in the unlawful use of force against Patty when taking her to the ground, but also failed to intervene while Chauvin subjugated Patty under his knee.

8.      The City of Minneapolis's longstanding custom and practice of unchecked Fourth Amendment violations committed by MPD officers against its citizenry was the moving force behind the violation of Patty's constitutional rights.

2

9.      Chauvin's repeated use of excessive force culminated in his May 25, 2020 murder of George Floyd outside the Cup Foods store in Minneapolis, slowly asphyxiating the handcuffed, face-down, non-resistant Floyd by pressing his knee into the back of Floyd's neck for more than eight minutes, with the assistance and protection of three other MPD officers.  This kneeing maneuver was Chauvin's calling card, having used it against Patty, Zoya Code, John Pope, George Floyd, and likely many others.

10.     The City knew its officers, including Chauvin, were applying force to the necks and backs of prone (lying on their stomach) arrestees, despite the known, appreciated, and obvious risk of causing serious injury or death from positional asphyxia.

11.     Floyd's murder was witnessed and filmed by a brave and broad group of citizens, including at least one minor, who protested Chauvin's and his "cover" officers' actions.  Subsequent broadcasts of their recordings, and the officers' own BWC recordings from Evidence.com, finally led to accountability for Chauvin, who was eventually fired and convicted of murder, as well as criminally violating Floyd's and John Pope's federal civil rights.

12.     Like most aspects of the illegal policing practices in which the MPD has engaged for decades, the City's preference even after Floyd's murder would have been to stick with business as usual.  It took the courage of civilians, and later jurors, to stop Chauvin.

13.     But while still employed by the City of Minneapolis and MPD, Chauvin was a serial predator who was never stopped by the City—a walking *Monell* violation—

and who fully embraced the City's training on dangerous restraint techniques.  Patty—
like Code, Pope, Floyd, and likely many others—suffered the consequences.

## THE PARTIES

14.     Patty is, and was at all times material herein, a citizen of the United States
and a resident of the State of Minnesota.

15.     Patty was the valedictorian of her high-school class and matriculated at
Utah State University, graduating in 2003 at 20 years old with a degree in
communications and journalism.

16.     Patty worked for a time as a journalist at the *Salt Lake Tribune*.  She later
moved to the Twin Cities so that her husband could attend law school at the University of
Minnesota.

17.     In Minneapolis, Patty first worked as a journalist and researcher, as well as
a substitute teacher in the Minneapolis Public Schools' Transition Plus program, before
leaving to serve as the manager of her husband's solo legal practice, a job she held for
several years.

18.     In 2016, Patty helped a friend, Andrew Johnson, run for the Minneapolis
City Council, serving as his campaign's communications director.  Aided by Patty's
efforts, Johnson was elected.

19.     Based on Johnson's recommendation, Patty was then hired by another
Minneapolis City Council member, Linnea Palmisano, as a policy aide.

4

20.     In December 2017, Patty took a new position as the communications and public outreach director for the Minneapolis Department of Public Works – a job she continued to hold when the events giving rise to this lawsuit transpired.

21.     In early 2020, Patty was dealing with several difficulties in her personal life, including the deteriorating health of her father-in-law, her separation from her husband, and the resultant co-parenting of the couple's two children as they headed towards a formal dissolution of their marriage.  The situation left Patty in a depressed state and she, at times, turned to alcohol as a result.

22.     All of this made Patty the perfect prey for Chauvin, who frequently escalated situations, acting as the aggressor against individuals less likely to have resources to fight back (*e.g.*, individuals suffering post-partum depression, mental health issues, single women or black youth).

23.     Chauvin was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of his employment as an MPD police officer.

24.     Jensen was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and duly acting in the course and scope of her employment as an MPD police officer.

25.     Patty asserts Fourth and Fourteenth Amendment claims under 42 U.S.C. §§ 1983 and 1988 against Chauvin and Jensen in their individual capacities, for misconduct occurring under color of state law.

26.     Patty further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

27.     The MPD is not a separately suable entity but rather is an arm of the City. The City is a municipality duly incorporated under the laws of the State of Minnesota.

28.     Patty's causes of action arise purely out of federal law.  State-law claims and, by consequence, limitations and defenses under state law are not applicable to this civil-rights lawsuit.

29.     Original jurisdiction over this matter exists pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

30.     The events giving rise to this action occurred in the City of Minneapolis. Venue is thus proper in this Court under 28 U.S.C. § 1391(b)(2).

## THE CITY ENCOURAGES AND ENABLES PREDATORY POLICE OFFICERS AND UNCONSTITUTIONAL USE-OF-FORCE PRACTICES

31.     The City fulfills its policing functions through the MPD, which has long looked the other way when its officers have engaged in misconduct.

32.     MPD's history of excessive force dates back to the 1980s, if not earlier. From 1983 to 1987 alone, 227 complaints of excessive force were filed against MPD officers – yet none was upheld by the City.

33.     The misconduct continued over the ensuing years.  In 1994, a federal jury concluded that the City maintained a custom of deliberate indifference to complaints

about excessive force within MPD.  Yet even this did not spur change within the police department.

34.     The widespread misconduct by MPD officers persisted into the 21st century.  Data published in the Minneapolis *Star Tribune* on August 17, 2013, revealed that MPD officers were then defendants in 61 lawsuits.

35.     One of those lawsuits was commenced by Darryl Gill, who had a dreadlock ripped out by MPD officer Sundiata Bronson; Bronson then broke Gill's wrist while he was handcuffed.  Both actions by Bronson constituted excessive force.

36.     Notably, Bronson's misconduct towards Gill occurred less than a year after he employed excessive force against Melvin Dickerson, slamming Dickerson's face into a plate-glass window and causing injuries requiring 22 sutures.

37.     But MPD took no action, and Bronson kept trampling citizens' civil rights.

38.     In 2012, Bronson assaulted Zachary King for lawfully carrying a firearm with a permit, landing King in the hospital.  The City settled King's subsequent civil-rights lawsuit for $122,000.

39.     By the time Bronson retired in 2014, there had been at least thirteen citizen complaints lodged against him, and yet the only discipline imposed by MPD was for improperly operating his squad car.  Cumulatively, the City paid out more than half a million dollars to settle six lawsuits in which Bronson was accused of misconduct.

40.      Bronson's conduct, and the City's failure to do anything about it, was no aberration.  Numerous other MPD officers were mollycoddled by the City, despite clear use of improper and excessive force.

41.     For example, in August 2009, MPD officer Joel Pucely threw to the ground and punched Ira Stafford during a traffic stop in which Stafford was not resisting.  The stop culminated with an officer pressing a knee into Stafford's back while he was on the ground in the prone position.  The City settled Stafford's subsequent lawsuit.

42.     Pucely, who remains an MPD officer today, has had at least nine citizen complaints lodged against him; none were sustained by the City.

43.     Another lawsuit alleged that in October 2014, two MPD officers— including Tou Thao, one of the officers involved in George Floyd's murder—punched, kicked, and kneed Lamar Ferguson after he had been handcuffed.  The City settled Ferguson's subsequent lawsuit, too.

44.     Like Bronson and Pucely, numerous complaints had been lodged against Thao, with none sustained and no discipline imposed.  Thao's MPD employment ended only after he participated in Floyd's murder.

45.     The above instances are just mere examples of why MPD officers have the long-held belief that they can violate the U.S. Constitution without suffering negative consequences.

46.     The City has paid nearly $80,000,000 in the last two decades as a result of the unconstitutional use of force by MPD officers.

47.     Rather than deal with the problem, the City—through a variety of bodies including the City Council, the Mayor, the City Attorney's Office, and a number of faux civilian police "oversight" boards—enables MPD to the detriment of its citizens, who are the subjects of unconstitutional force practices.

8

48.     The longstanding culture of the MPD enables officers to make unconstitutional force decisions with impunity.  The *Star Tribune* reported that the City's twelve costliest settlements from 2006 to 2012 resulted in no officer discipline.

49.     This "business as usual" would have continued with regard to Defendant Chauvin even after he murdered George Floyd, but for civilians who witnessed and filmed the events culminating in his death.

50.     MPD's policies, practices and customs, along with its longstanding failure to discipline offending officers, have led to a pattern and practice of excessive force by MPD officers.

51.     The depth and breadth of MPD's history of misconduct has, more recently, led to investigations into the department's policing practices by both the United States Department of Justice and the Minnesota Department of Human Rights (DHR).

52.     On April 27, 2022, the DHR published a 72-page report detailing its findings after a nearly two-year investigation into MPD's policing practices.

53.     That investigation included reviewing hundreds of hours of BWC footage from MPD officers and nearly 480,000 pages of documents; observing 87 hours of MPD Academy trainings for newly hired police officers; participating in "ride-alongs" with MPD officers in each of MPD's five precincts; analyzing a decade of MPD data regarding officers' uses of force and nearly 3-1/2 years' worth of data on MPD traffic stops and prosecutions; and reviewing use-of-force files and police-misconduct complaints and investigations.

54.     The DHR also interviewed, *inter alia*, current and former MPD officers (from the rank of Chief down to the rank of patrol officer) and staff members, City staff involved with public safety, prosecutors from the City Attorney's and Hennepin County Attorney's Offices, other public-safety employees such as firefighters, health-care professionals and attorneys in the Twin Cities area, and more than 2,200 community members.

55.     After completing its investigation, the DHR concluded that excessive force and lack of accountability are institutional norms at the MPD, and have been for years.

56.     A key problem, according to the DHR, is that MPD officers and supervisors receive improper training "which emphasizes a paramilitary approach to policing that results in officers unnecessarily escalating encounters or using inappropriate levels of force."

57.     Indeed, the DHR found that as a result of MPD emphasizing aggression during training, officers repeatedly "us[e] inappropriate levels of force with community members" and "resort to higher levels of physical force . . . even when the individual does not pose an imminent threat to officers or others."

58.     Another problem is that MPD reinforces a culture of unquestionable deference and obedience to senior officers and establishes a warrior mindset with fledgling officers from their very first days as new MPD officer hires.

59.     Such unquestionable compliance is antithetical to the Constitution of the United States and MPD's own policies, including an officer's duty to intervene and duty to report unauthorized use of force.

60.     Each of these—the inappropriate use of force, the failure to intervene to stop that force, and the failure to properly report unauthorized force—happened with respect to the incident with Patty on January 17, 2020.

61.     Furthermore, these and other problems are baked into MPD's field-training program, in which rookie officers are paired with veteran officers for on-the-ground training.  Field trainers have a lasting impact on rookie officers, yet these veteran officers receive no real instruction on how to mentor and train young officers, or more importantly, how not to.

62.     Moreover, MPD routinely allows veteran officers to serve as field trainers despite reports or findings of misconduct against them.

63.     The DHR noted that "[i]f a field training officer uses unauthorized force or otherwise exhibits police misconduct while they are training a rookie officer, then they are training that rookie officer that using unauthorized force is, in fact, acceptable and even expected."  This is an especially serious problem in an environment in which new officers are expected to demonstrate unquestioned compliance with senior officers, particularly because field-training officers "play a significant role in determining whether a rookie officer ultimately passes their probationary period."

64.     Equally troubled are MPD's so-called accountability systems, which are insufficient and ineffective at holding officers accountable for misconduct.

65.     Indeed, MPD's Internal Affairs Unit and the Office of Police Conduct Review are simply toothless tigers that have failed to provide any meaningful

11

independent review of challenged conduct, particularly because MPD officers and/or supervisors are embedded in the review process.

66.     For example, uses of force are initially reviewed by shift supervisors, typically Sergeants.  Yet, those supervisors themselves often have been accused of or engaged in misconduct, including the use of excessive force.

67.     Routinely—and especially when criminal or civil liability or discipline is a likelihood—the so-called "review" of alleged misconduct is farcical.  Despite having at their disposal critical pieces of objective evidence—most notably BWC videos of officers at the scene, but also (among other things) MPD training materials, third-party videos, and weapon-system-manufacturer recommendations and warnings—the "investigators" ignore that objective evidence because the "review" actually is designed to avoid accountability rather than identifying and addressing misconduct.

68.     These "investigations" are intentionally skewed to reach a pre-ordained result, in which either no discipline or impotent "counseling" is imposed.

69.     Importantly, "counseling" does not make it into an officer's personnel file because it is not formal discipline.  This system hinders accountability and allows the unlawful status quo within MPD to continue unabated.

70.     In short, instances of misconduct are not properly investigated, not timely addressed, and officers are not consistently held accountable, even when BWC evidence or other objective evidence contradicts an officer's use-of-force reporting.

71.     This helps to explain why Defendant Chauvin acted so nonchalantly when he murdered George Floyd on film and violated the civil rights of Patty, Zoya Code, John Pope, and others while being filmed by MPD's own equipment.

72.     By ignoring BWC videos and otherwise, MPD supervisors simply do not adequately review or assess inaccuracies or false statements made by officers in their use-of-force reports.  The truth be damned.

73.     Patty's situation is another example of MPD's status quo:  there has been zero accountability by the City or MPD for the Defendant officers' misconduct involving Patty on January 17, 2020.

74.     Without a fair, objective, non-biased and consistently applied system of oversight in place, these problems have festered for years, all while City and MPD leaders have known about them and refused to do anything.

75.     The MPD's hyper-aggressive, paramilitary culture has resulted in the repeated use of unlawful and excessive force by its police officers and was a direct cause of Chauvin's and Jensen's unlawful treatment of Patty on January 17, 2020.

76.     Persons at the highest echelons of City government and the MPD, including several Chiefs of Police, have long been aware of the widespread, unlawful use of force by MPD officers and have repeatedly failed to address it.  They have been complicit in the lack of accountability.

77.     Indeed, the DHR found that MPD's Chiefs have been reluctant over the years to impose discipline, allowing investigations to sit on their desks without final review or a disciplinary decision for an average of nearly 15 months.

78.     Likewise, every monetary settlement of a lawsuit against the MPD requires approval—knowledge—by the Mayor and the Minneapolis City Council.

79.     But nothing has been done, and thus no meaningful changes have occurred. Frankly, all there has been is lip service and empty promises.

80.     This lawsuit, and other federal civil-rights lawsuits, are necessary to pull the curtain back.  For accountability.  For change.

81.     The lack of collective and sustained action among City and MPD leaders has allowed this organizational culture to suppurate within MPD and has resulted in unlawful policing practices that undermine public safety.

82.     The DHR's report also highlighted other systemic issues at MPD that impacted Patty.

83.     For example, the City has been aware for years that MPD officers were restraining subjects in ways likely to cause death or serious bodily injury, including by pressing down on subjects' backs after they had already been restrained.

84.     On September 9, 2010, MPD officers Timothy Gorman and Timothy Callahan responded to the Minneapolis YMCA, where David Smith was in the midst of a mental-health crisis.

85.     The encounter ended with Smith handcuffed behind his back in the prone position – just like Patty.

86.     Despite being handcuffed and controlled, Smith was held in the prone position by Callahan and Gorman for at least 4-1/2 minutes, with Gorman kneeing on Smith's back and Callahan straddling his thigh/buttocks region.

14

87.     Smith had no pulse and showed no signs of life by the time Callahan and Gorman finally made any effort to observe his medical condition.

88.     Hennepin County Chief Medical Examiner Andrew Baker ruled Smith's death a homicide, with the cause of death anoxic encephalopathy due, to or as a consequence of, cardiopulmonary arrest caused by mechanical asphyxia.

89.     Every then-employed MPD officer (including Chauvin) knew about the Smith incident.

90.     The Smith incident was a clear example of excessive force – Gorman kneed on Smith's back while Smith was handcuffed, fully controlled, and non-responsive for at least five minutes.  No reasonable officer could believe that the use of such force was objectively reasonable.

91.     Yet, the MPD took no disciplinary action against Callahan or Gorman and, instead, deemed their actions consistent with policy and training.  MPD Spokesman John Elder said the following regarding the Smith incident:  "As tragic as the incident was, the officers tried their best, and if mistakes were made they were done so under the standard law enforcement practices and training at the time."

92.     Elder's ridiculous statement is but one example of MPD's ratification of patently unreasonable force decisions by its officers.

93.     The City paid $3,000,000 to settle the Smith family's lawsuit.

94.     Then-Minneapolis Mayor R.T. Ryback and then-MPD Chief Janee Harteau's statements regarding the homicide—which focused on "mounting legal costs" and the impact on the *officers*—were telling.

95.    Rather than deal with the core problem, unchecked and undisciplined use of excessive force by MPD officers continued.

96.    If the City refuses to pay for a good police force, it will pay dearly for a bad one.

97.    On June 16, 2023, the United States Department of Justice (DOJ) issued a 92-page report echoing the damning conclusions reached by the DHR.

98.    As with the DHR's investigation, the DOJ undertook to "review [] thousands of documents, incident files, body-worn camera videos, and the City and MPD's data," in addition to having "ride-alongs and conversations with MPD officers, City employees, mental health providers, and community members."

99.    In the end, the DOJ—like the DHR—found that the City and MPD engage in a pattern or practice of conduct that deprives people of their rights under the Constitution.

100.    Among the rights violations noted by the DOJ was that MPD officers routinely used excessive force, including unjustified deadly force and other types of force.

101.    Indeed, the DOJ found that in roughly *three quarters* of MPD's reported uses of force that it had analyzed, there was not an "associated violent offense or a weapons offense" to justify it.  The DOJ faulted MPD for employing "dangerous techniques and weapons against people who committed at most a petty offense and sometimes no offense at all."

102.   The DOJ also found that officers used force to punish people who made officers angry or criticized the police.

103.   And, the DOJ found that MPD routinely used unreasonable takedowns, strikes, and other bodily force, "including against compliant or restrained individuals." According to its report, MPD officers "aggressively confront people suspected of a low-level offense—or no offense at all—and use force if the person does not obey immediately."

104.   Of particular relevance here, the DOJ noted that MPD officers frequently use "gratuitous force," that is, force used on persons already restrained, subdued, and handcuffed.  This type of force is "a completely unnecessary act of violence, and it violate[s] the Fourth Amendment."

105.   Moreover, like the DHR, the DOJ noted that "persistent deficiencies in MPD's accountability systems, training, [and] supervision" contributed to MPD officers' violations of the Constitution.

106.   MPD supervisors, according to the DOJ, did not conduct meaningful force reviews and "often take an officer's word for what occurred *even when the video shows something different*."

107.   Simply put, "[s]ystemic problems in MPD made what happened to George Floyd possible."

108.   This is no less true of what happened to Patty.

## THE CITY EMBOLDENS DEFENDANT CHAUVIN TO RUN AMOK

109.    Chauvin became an MPD officer in 2001.  This provided him over fifteen years to steep in the culture that led officers to understand they were free to use excessive force with impunity.

110.    Before his encounter with Patty in January 2020, Chauvin had at least sixteen civilian complaints levied against him.  The only consequences of these complaints were, at most, two letters of reprimand.

111.    In 2005, Chauvin participated in a reckless police chase resulting in three deaths.

112.    In another incident in November 2013, Chauvin and other officers pulled over LeSean Braddock, a mental-health worker at Hennepin County Medical Center.  Much like Chauvin did to Patty, the officers dragged Braddock from his car and slammed him to the ground, then kneed on his neck and back as he lie prone.

113.    Each of these incidents resulted in a complaint being lodged against Chauvin with the MPD.  Yet none resulted in any discipline being imposed upon him.  Instead, the MPD perversely responded by allowing Chauvin to assume the role of field-training officer.

114.    Chauvin, like Bronson, Pucely, Thao, and many other MPD officers, engaged in repeated misconduct with the City's tacit authorization.

115.    Indeed, Chauvin was a serial predator, repeatedly attacking vulnerable persons whether they be minors, mentally ill, or otherwise – they were all prey!

116.    In June 2017, Chauvin and his then-partner Ross Blair arrested Zoya Code at a residence in North Minneapolis in connection with a domestic incident.

117.    Code posed no threat to the safety of the officers at the time of her arrest. She was unarmed and considerably smaller than each officer.

118.    Nevertheless, Chauvin and Blair forcefully took Code to the ground before cuffing her hands behind her back.  Then, Chauvin gratuitously torqued Code's arms upward, behind her back and awkwardly towards her head, and proceeded to carry her in this chicken-wing fashion out of the residence.

119.    Once outside, Chauvin intentionally slammed Code's unprotected head on the ground.  He then took his signature pose, kneeing on the back of Code's neck for several minutes before she was finally loaded into a squad car.

120.    Chauvin's supervisor, MPD Sergeant Tammy Werner, later reviewed and *approved* Chauvin's unlawful use of force on Code.

121.    Barely three months later, Chauvin used excessive force against John Pope, a 14-year-old boy.

122.    On the evening of September 4, 2017, Chauvin and his then-partner, Alexander Walls, responded to Pope's mother's home in response to a 911 call.  The officers arrived and found a peaceful scene, where Pope's mother explained she had called 911 because of a dispute about cell-phone chargers.

123.    After spending approximately a half hour calmly filling out paperwork and speaking to Pope's mother, Walls and Chauvin walked through the home to a bedroom, where John was lying quietly on the floor using a cell phone.

19

124.    Walls told Pope that he was under arrest and ordered him to stand up.  Pope protested that he had done nothing wrong.

125.    But when Pope did not comply quickly enough with Walls's commands to stand, Chauvin—the aggressor—raced into the bedroom and struck Pope in the head repeatedly with a large metal flashlight; grabbed him around the throat with his hand in a C-clamp and pinned him that way against a wall; forced Pope to the floor and placed him in a rear-naked chokehold; and, finally, pressed down on Pope's back with his knee— while Pope was face down, handcuffed and non-resisting—for more than fifteen minutes.

126.    At least eight other MPD officers witnessed Chauvin on Pope's back.

127.    A number of those eight MPD officers turned their backs as Pope cried that he could not breathe.

128.    None of the eight MPD officers stepped in to intervene.

129.    None of the eight MPD officers reported the event as they were required to do.

130.    As had happened with Code, an MPD supervisor, Sergeant Lucas Peterson, approved Chauvin's use of force against Pope.

131.    While Peterson's approval of Chauvin's force on Pope was business as usual for the MPD, his approval and ratification was chastised by the DHR report as *the* example of how "**MPD leaders do not hold supervisors accountable for their inadequate review of officers' use of force.**" (emphasis in original).

132.    Unsurprisingly, Peterson is a long-troubled MPD officer.

133.    Chauvin employed his signature move against both Code and Pope just months after doing the same to Patty, subjugating them by pressing down on them with his knee after they had already been handcuffed and posed no threat.

134.    Despite knowledge of Chauvin's long history of misconduct, the evidence of which (including the incidents involving Code and Pope) has always been under the City's and MPD's control and stored in Evidence.com, City policymakers allowed Chauvin to stay on the force long enough to murder George Floyd on May 25, 2020.

135.    Chauvin killed Floyd using his signature move—a knee to the neck—which, although deadly force as applied to Code and Pope, miraculously had not yet killed someone before Floyd's murder.

136.    Chauvin violated the civil rights of Patty, Code, Pope—and likely many others—with the City's express or tacit approval.

137.    Indeed, Chauvin's signature move even against handcuffed and controlled arrestees had already been met with approval by MPD policymakers, after David Smith was killed—resulting in a multi-million-dollar settlement—without any disciplinary measures taken against the offending officers.  Instead, the City continued to train its officers that kneeing on the necks and backs of subdued arrestees was appropriate and lawful.

138.    The failure to levy any real discipline against him or other MPD officers caused Chauvin to freely and openly violate Patty's constitutional rights on January 17, 2020.

139.    Had MPD disciplined Chauvin for his conduct involving Patty, Code or Pope, history could have been stopped from repeating itself with George Floyd.  But what else could be expected from the MPD?

140.    Chauvin was convicted of murdering Floyd on Apil 20, 2021.  He later pleaded guilty to federal charges alleging he violated Pope's and George Floyd's civil rights.

141.    In the federal Plea Agreement, Chauvin admitted that, while acting under color of law as an MPD officer on September 4, 2017, he willfully deprived Pope of his constitutional rights – specifically, the right to be free from an unreasonable seizure, which includes the right to be free from the use of unreasonable force by a police officer.

142.    In the Plea Agreement, Chauvin admitted that, without legal justification, he held his knee on Pope's neck, shoulders, and upper back even after Pope was lying prone, handcuffed, and unresisting, resulting in bodily injury.

143.    In the Plea Agreement, Chauvin "admit[ted] he also used unreasonable and excessive force on [Pope] by holding his knee on [Pope's] neck, shoulders, and upper back for between fifteen and sixteen minutes.  During this period, [Pope] was face-down on the floor, handcuffed, and unresisting.  During [Chauvin's] restraint, [Pope] cooperated with police directions and, at times, cried from pain."

144.    In the Plea Agreement, Chauvin admitted that he had been trained that "if an arrestee is in the prone position, that position may make it more difficult to breathe, and thus, officers should move that arrestee to a side recovery or seated position."

145.    The City of Minneapolis paid $27 million to settle a lawsuit brought by Floyd's next of kin for Chauvin's and other officers' violation of Floyd's civil rights.

146.    The City of Minneapolis paid $7.5 million to settle a lawsuit brought by Pope for Chauvin's and other officers' violation of his civil rights.

147.    The City of Minneapolis paid $1.375 million to settle a lawsuit brought by Code for Chauvin's and other officers' violation of her civil rights.

148.    As Minneapolis City Council member Elliott Payne remarked after the Pope and Code lawsuits were settled, "These cases are a reminder that [Chauvin] got to exist that way as part of our institution.…It's an institution problem."

149.    The DHR and DOJ investigations (and findings) ultimately resulted in a 144-page Court Order mandating structural, policy, training, and oversight changes at the MPD.

150.    While it is too soon to tell whether those mandated changes will have any real effect on the MPD's broken culture, they came too late to protect Patty from Chauvin's and Jensen's violation of her constitutional rights.

## THE INCIDENT WITH PATTY

151.    Around 7:45 pm on January 17, 2020, an individual called 911 to report an intoxicated person in a vehicle outside his residence on 41st Avenue South in Minneapolis.

152.    The caller explained that the vehicle, a Volkswagen minivan, was stuck and that an intoxicated woman had been sitting inside it for "a while."  The caller expressed

concern that the woman would attempt to drive away and wanted officers to respond to "prevent that."

153.    There was no report of a weapon.  Nor did the caller report any type of threatening behavior.

154.    The woman in the "stuck" minivan was Patty.

155.    Patty was depressed.  She and her husband had recently decided to divorce after nearly 15 years of marriage.  Months of counseling had been unsuccessful.  Patty worried about her future, and the future of her two young children.

156.    Patty spent the afternoon of January 17, 2020, drinking at home.  She became intoxicated and fell asleep.  She woke to an alarm reminding her to pick up one of her children from daycare.

157.    Patty got into her minivan and started driving.  It was snowing.

158.    After traveling only a couple of blocks from her house, Patty realized she should not be driving and pulled over to park.  In the process, her minivan became stuck in a snowbank on the west side of 41st Avenue South, near the caller's residence.

159.    Patty had left her cell phone at home in her rush to get to daycare and could not call for help.  Depressed and intoxicated, she felt hopeless.  She turned the minivan off and sat alone in the driver's seat, sobbing.  To ensure she would not drive, she threw the minivan's keys into the back of the vehicle.

160.    After some time, Patty became cold.  Temperatures outside were around 20 degrees.  So, Patty decided to start the engine to run the heat.

161.    Patty used the vehicle's remote-start function to start the minivan.  She left the keys in the back—ensuring the vehicle could not be driven, as it required the keys to be physically in the ignition in order to move—and sat in the driver's seat, leaving the engine running to stay warm.

162.    Patty sat this way for several hours—ultimately leading to the 911 call.

163.    That call was not deemed urgent, and officers did not immediately respond.

164.    Nearly 40 minutes after the first call came in to 911, someone dialed 911 again, reported that Patty was attempting to drive off, and asked for an officer to respond.

165.    Patty could not in fact drive off, as the keys remained in the rear of the minivan, rendering it immobile.

166.    Regardless, Defendants Chauvin and Jensen were dispatched in response to this second call.  They arrived on scene at approximately 8:50 pm, more than an hour after the initial 911 call.

167.    The exact circumstances of the subsequent interaction between Patty and Defendants Chauvin and Jensen are not clear because the City has refused repeated requests to release BWC video of the incident—even though the City initially tendered copies of the video to Patty's criminal-defense counsel as part of her (now-dismissed) criminal case *and* entered the video into evidence at a hearing in that case.[1]

168.    This City's recalcitrance is unsurprising, as the City Attorney's Office routinely uses faux confidentiality concerns under the Minnesota Government Data

---

[1] Patty's criminal counsel did not maintain copies of the videos given the wholesale dismissal.

Practices Act (MGDPA) to withhold BWC video from persons depicted thereon—despite clear law mandating its release. *See* Minn. Stat. § 13.825, subd. 2(a)(2), 4(b).

169.    Likewise, the City routinely withholds BWC video depicting officer misconduct.

170.    Yet, the City is all too happy to release BWC or other video when it appears to *absolve* its officers of wrongdoing.

171.    In any event, Patty jumped through the City's artificial hoops and submitted an MGDPA request for BWC video of the incident in April 2023 – more than a year ago.

172.    To date, the City has not provided the requested video.  When Patty inquired about the status in March 2024—*eleven months* after submitting her request—she was told that "[t]here are 27 requests ahead of yours."

173.    The City appears to be intentionally dragging its feet because it would prefer that video of the encounter remain out of public view.

174.    Regardless, due to the absence of video, the descriptions that follow come from Patty's own recollection of events, police reports of the incident, and pleadings and orders in her criminal case, rather than from the objective video evidence.

175.    According to Jensen's police report, upon arriving on scene she observed Patty's vehicle on the westbound side of 41st Avenue South, with its passenger side turned into a snowbank, almost blocking the sidewalk.

176.    As Jensen approached the minivan, two people were speaking to Patty through the driver's window.  They reported to Jensen that they believed she "has a bad

26

situation at home and pulled over to rest," and they worried it was not safe for her to drive.

177.    Jensen then talked to Patty through the window.  Patty attempted to explain to Jensen that the minivan was not capable of being driven because the keys were not in the ignition.  She told Jensen that the keys were in the back of the vehicle.  She gestured repeatedly to the ignition to show Jensen there were no keys.

178.    Jensen did not understand what Patty was attempting to explain and pointed out that the vehicle was running.  According to Jensen, Patty had bloodshot, watery eyes and she (Jensen) believed Patty was impaired.

179.    At this point, Chauvin approached the open window, reached inside the vehicle, and unlocked and opened the minivan's driver's door.

180.    Chauvin and Jensen then violently grabbed Patty's left and right arms, respectively, and began pulling her out of the vehicle.

181.    According to their police reports, the officers claimed they had first ordered Patty to exit the vehicle.  But following an evidentiary hearing in her criminal case, Hennepin County District Judge Julie Allyn—who actually watched the BWC video the City has refused to provide to Patty—concluded that Patty "was *not* given any orders before officers began pulling her out of the vehicle."

182.    Nor did Chauvin or Jensen inform Patty that she was under arrest before attempting to physically remove her from the minivan.

183.    Patty called out "don't touch me please" and "no" in response to the officers' actions.  At this point, according to Judge Allyn's order, the officers finally

27

commanded Patty to exit the vehicle, but she couldn't because the officers were in the doorway, blocking her ability to exit.

184. The officers then forcefully yanked Patty from the driver's seat and flung her face down onto the ground in the middle of the street.

185. At no point in time did Patty pose an immediate threat to the Defendant officers or anyone else to justify such violent and excessive force.

186. The impact from the takedown cracked one of Patty's teeth. Her left arm and shoulder immediately seared in pain. Her face, arms, hands, chest, ankle and legs were scraped and bruised from impacting the roadway.

187. Chauvin then assumed his signature pose, driving his knee into Patty's back and pressing her into the snow-covered ground below. Patty was not resisting, and her hands were quickly cuffed. But Chauvin did not immediately release his knee, continuing to kneel down on Patty for some time after the cuffing was complete, all while Patty was subdued, crying, calling out in pain, and not resisting.

188. After being handcuffed, Patty never actively resisted arrest or attempted to evade arrest by flight.

189. After being handcuffed, Patty never posed an immediate threat to the safety of officers or others.

190. Patty was not charged with assault, battery, resisting arrest, disorderly conduct, or any similar crime arising out of the incident.

191. The officers eventually stood Patty up and unceremoniously dumped her into the back seat of their squad car, lying on her side.

28

192.    Chauvin and Jensen then summoned another officer, Jeremy Brodin, to administer a breath test to Patty.

193.    According to his police report, Brodin administered field-sobriety tests to Patty and concluded she was impaired.  Patty purportedly refused to perform a preliminary breath test (PBT).

194.    Brodin then informed Patty she was under arrest for driving while impaired (DWI).  She was moved to Brodin's squad car and driven downtown for chemical testing. Patty's minivan was towed from the scene.

195.    Downtown, Patty agreed to a PBT.  Records from that test show a .25 blood-alcohol content.

196.    Patty complained about her injuries to Brodin and asked for medical attention.  None was provided.

197.    Patty was, however, allowed to use the telephone.  She called her soon-to-be ex-husband.

198.    Patty was then transported to the Hennepin County Jail, where she would spend the next 2-1/2 days.  She was unable to bond out until Monday, January 20, due to it being a holiday weekend.

199.    Patty's soon-to-be ex-husband visited her at the Hennepin County Jail on the morning of Saturday, January 18.

200.    As soon as they were left alone, Patty began crying uncontrollably, complaining that the officers had violently ripped her from the car and thrown her to the ground unnecessarily.

201.  Her soon-to-be ex-husband noted that Patty "looked beat up," had bruises on her hands and left arm, and that her left hand was extremely swollen.  She looked like she had "gone 10 rounds."  He took pictures of Patty's injuries with his cell-phone camera.

202.  Upon her release, Patty's soon-to-be ex-husband took additional pictures of some of her injuries, especially her arms.  Her left arm was particularly bruised and swollen from the officers' manhandling:





203.    At approximately 10:50 pm on January 17, 2020, Chauvin prepared a report about the encounter with Patty.

204.    In that report, Chauvin lied about his actions that evening and omitted the true extent of his assault.

205.    Chauvin first downplayed the force he had employed, innocuously writing only that he "pulled" Patty from the driver's seat and "pulled [her] facedown" onto the street.

206.    Worse, Chauvin nowhere reported that he drove his knee into Patty's back and pressed her into the ground, including after she had already been handcuffed.  The report also made no mention of Patty's injuries.

207.    Jensen also wrote a report that evening about the encounter with Patty.  Her report was just as misleading as Chauvin's.

208.    Jensen failed to report that she and Chauvin forcefully yanked Patty from the minivan and threw her to the ground.  She documented only that she and Chauvin "attempted to assist [Patty] out of" the vehicle, a *post hoc* sanitization of what had actually occurred.

209.    Moreover, nowhere in her report did Jensen document that Chauvin had pinned Patty to the ground with his knee and kept it there after she had been handcuffed and subdued.  And she, too, failed to note that Patty was injured.

210.    Each of these reports was designed to prevent any accountability for the misconduct committed by Chauvin and Jensen.  The officers covered for one another – per usual.

211.    The material lies and omissions in the officers' reports are the type that MPD rank and file are accustomed to making without consequence or repercussion from supervisors and those all the way up the chain of command.

212.    Neither Chauvin nor Jensen completed a use-of-force report regarding their interactions with Patty on January 17, 2020.

213.    Neither Chauvin nor Jensen completed an injury report regarding their interactions with Patty on January 17, 2020.

214.    Upon information and belief, neither Chauvin nor Jensen was disciplined by the City or MPD as a result of their interactions with Patty on January 17, 2020.

### A MINNEAPOLIS CITY ATTORNEY CONDEMNS CHAUVIN'S AND JENSEN'S ACTIONS TOWARDS PATTY, AND THE CRIMINAL CHARGES ARE DISMISSED

215.    Patty was charged with two gross misdemeanor counts of third-degree DWI arising out of the January 17, 2020 incident.  *See State v. Day*, Case No. 27-CR-20-2110 (Hennepin County District Court).  She also had her driver's license temporarily revoked.

216.    As the criminal charges were not felonies, Patty was prosecuted by the Minneapolis City Attorney's Office.

217.    On February 10, 2021, Hennepin County District Judge Julie Allyn held an evidentiary hearing in Patty's criminal case.  Assistant Minneapolis City Attorney Annalise Backstrom appeared on behalf of the prosecution at that hearing.

218.    Nine months earlier, of course, Chauvin had murdered George Floyd.  His wrongdoing finally had been exposed for the world to see.  As of February 10, 2021, Chauvin was awaiting trial on his state murder charges.

219.    At the start of the evidentiary hearing, Assistant Minneapolis City Attorney Backstrom noted for the court Chauvin's involvement in the case and her intent to show at the hearing "some video that involves him and some conduct of his" – referring to BWC video from the incident.  Notably, it was not Patty's conduct that was highlighted by the Assistant Minneapolis City Attorney.

220.    Assistant Minneapolis City Attorney Backstrom then offered the following:

*I just want to make clear that my office and myself in particular don't condone the way that the interaction went down in this particular case.*
I have looked at this case extensively and <u>talked it over with management</u>.  It was decided that the appropriate compromise between the criminal conduct that's alleged in this case and the treatment of Miss Day would be a fourth degree DWI resolution, which is something that we usually never do for someone [who] tested at a point 25, but as a compromise *because of how she was treated*, that was the offer that was extended.

221.    In other words, one of Minneapolis's *own* attorneys, as well as City "management," had reviewed the BWC video and clearly found the officers' conduct out of bounds.

222.    Following the evidentiary hearing, on April 16, 2021, Judge Allyn granted Patty's motion to suppress evidence—including her PBT results.  Specifically, Judge Allyn concluded that Patty was arrested when the officers yanked her from the minivan but that they lacked probable cause to charge her with DWI at that time.

223.    Likewise, Judge Allyn concluded that the officers did not have probable cause to charge Patty with obstructing legal process – a crime that neither the officers nor the City Attorney's Office had actually charged.

224.    Judge Allyn noted that Jensen had written in her police report (and testified at the evidentiary hearing) that Patty "tensed up" and tried to pull away when the officers were first attempting to remove her from the minivan.

225.    "Tensing up" is police officer arble-garble, an amorphous and unspecific allegation routinely leveled by officers in an attempt to justify unlawful uses of force.

226.    Regardless, Judge Allyn concluded this would not suffice for obstruction, noting:

> Officer Jensen testified she felt Day tense up, pull away, and not obey commands to exit the vehicle while [o]fficers tried to pull Day out of the car. Day was not given any orders before officers began pulling her out of the vehicle. The fact she "tensed up," and tried to pull away, within the small confines of a vehicle, could be a normal physical reaction to being abruptly grabbed by police. There was no testimony that Day physically assaulted or touched the officers, and Day screaming "no" did nothing to prevent [o]fficers from pulling her out of the car. Once on the ground, there is no evidence Day prevented the [o]fficers from handcuffing her. Day's conduct, instead, acted merely to briefly impact the ability of the [o]fficers to successfully apprehend her. *That type of conduct is insufficient to support a finding that there was probable cause to arrest her for obstruction.*

227.    In other words, Patty's actions that day did not and could not justify charging her with obstructing legal process—let alone possibly justify the significant, violent force used against her.

228.    After Patty's motion to suppress was granted, the City Attorney's Office dismissed the pending charges for lack of evidence.

## PATTY'S INJURIES

229.    Patty was extremely embarrassed by the events of January 17, 2020.  She had no prior criminal history and, as noted above, at the time of her arrest she worked for

the City of Minneapolis handling communications and outreach for the City's Department of Public Works.

230.   On January 22, 2020, Patty presented to West River Dental Care with the broken tooth sustained as a result of Chauvin's and Jensen's conduct.  She underwent emergency tooth repair and was recommended for a permanent crown, which she later received.  She told the dentist that the cracked tooth resulted from slipping and falling on ice rather than revealing the embarrassing truth about how it had occurred.

231.   Patty also had a deep cut on her left hand that was slowly healing.  The cut eventually scarred – leaving her with a daily reminder of the events of January 17, 2020.

232.   In addition, Patty had a sprained ankle and was in significant left arm and shoulder pain following the incident, as well as having limited range of motion of her arms.  The pain made it difficult for her to sleep and gave her trouble lifting objects.  She hoped the pain would eventually subside and normal arm function would return, and due to her embarrassment, she refrained from seeking immediate medical care for her arm and shoulder problems.

233.   She did, however, attend regular deep-tissue massage and acupuncture sessions in the hope her symptoms would improve.  They did not.

234.   In September 2020, Patty finally presented to her primary care physician complaining of bilateral shoulder and arm pain.  She was referred for physical therapy.

235.   Patty attended several physical therapy sessions, which provided only limited relief.

236.   Patty continues to suffer from arm and shoulder problems today.

237.    In addition, since the incident Patty has experienced significantly increased anxiety and has been diagnosed with major depression disorder.  Seeing or hearing police cars is triggering.  While she had previously attended counseling sessions related to her divorce, the events of January 17, 2020, exacerbated and heightened her psychological issues.

238.    The psychological issues became so significant, in fact, that Patty was forced to take FMLA leave from work.

239.    Patty continues to be traumatized by the actions of Defendants Chauvin and Jensen and their inhumane treatment of her.

240.    Patty has experienced and continues to experience flashbacks to the night in question – including when Chauvin murdered George Floyd mere months after he assaulted Patty.

241.    Chauvin is the most infamous police officer in Minnesota (if not United States) history.  This exacerbates Patty's emotional suffering and increases the frequency of her flashbacks, as Chauvin's name is repeatedly in the news.  Indeed, every person in this state likely knows the name Derek Chauvin; Patty cannot easily avoid hearing about him, emotionally bringing her back to January 17, 2020, over and over again.

242.    Patty has difficulty discussing with others the events of January 17, 2020. She is embarrassed, guarded, and hesitant to relive the trauma.

243.    Patty, through her counsel, should have been able to rely on the *objective* evidence of the encounter, so that Patty herself could avoid reliving the trauma by

37

recounting details in order to bring the instant lawsuit.  But due to the City's continued withholding of the video evidence, Patty was re-traumatized.

244.   Patty has suffered and will continue to suffer from emotional distress, potentially for the rest of her life, due to the events of January 17, 2020.

## COUNT I

### FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendant Derek Chauvin in his individual capacity*

245.   Patty realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

246.   By the actions described above, Defendant Derek Chauvin, under color of state law, violated and deprived Patty of her clearly established and well-settled civil rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

247.   Defendant Chauvin subjected Patty to these deprivations of her rights either maliciously or by acting with reckless disregard for whether her rights would be violated.

248.   As a direct and proximate result of the acts and omissions of Defendant Chauvin, Patty suffered injuries, was forced to endure great pain and mental suffering, and was damaged in an amount exceeding $9,000,000.

249.   Punitive damages are available against Defendant Chauvin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

250.    Patty is entitled to fully recover her costs, including reasonable attorneys'
fees, under 42 U.S.C. § 1988.

## COUNT II

**FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS**
***Plaintiff v. Defendant Ellen Jensen in her individual capacity***

251.    Patty realleges and incorporates by reference herein each and every
allegation contained in each paragraph above as though fully set forth herein.

252.    By the actions described above, Defendant Ellen Jensen, under color of
state law, violated and deprived Patty of her clearly established and well-settled civil
rights to be free from excessive force under the Fourth and Fourteenth Amendments to
the United States Constitution.

253.    By the actions described above, Defendant Ellen Jensen, under color of
state law, further violated and deprived Patty of her clearly established and well-settled
civil rights under the Fourth and Fourteenth Amendments by failing to intervene in
response to Defendant Chauvin's unconstitutional use of force, with the realistic
opportunity to do so.

254.    Defendant Jensen subjected Patty to these deprivations of her rights either
maliciously or by acting with reckless disregard for whether her rights would be violated.

255.    As a direct and proximate result of the acts and omissions of Defendant
Jensen, Patty suffered injuries, was forced to endure great pain and mental suffering, and
was damaged in an amount in excess of $9,000,000.

256.    Punitive damages are available against Defendant Jensen and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

257.    Patty is entitled to fully recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### CIVIL RIGHTS VIOLATIONS
### MONELL V. DEP'T OF SOCIAL SERVICES
### *Plaintiff v. Defendant City of Minneapolis*

258.    Patty realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

259.    Before January 17, 2020, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted and/or ratified a custom, pattern or practice on the part of its officers of the improper use of force.

260.    By failing to discipline all officers consistently on this point, City and MPD policymakers, with the department's ratification and approval, have approved of a deficient policy, custom, or practice of the improper use of force.

261.    Patty's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City of Minneapolis is thereby liable in an amount in excess of $9,000,000.

262.    Patty is entitled to fully recover her costs, including reasonable attorneys'

fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Patricia Dawn Welch Day prays for judgment as follows:

1.    That this Court find that the Defendants committed acts and omissions

violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count I, a money judgment against Defendant Derek Chauvin for

compensatory damages in excess of $9,000,000 and punitive damages in an amount to be

determined by a jury, together with costs, including reasonable attorneys' fees under 42

U.S.C. § 1988 and prejudgment interest;

3.    As to Count II, a money judgment against the Defendant Ellen Jensen for

compensatory damages in excess of $9,000,000 and punitive damages in an amount to be

determined by a jury, together with costs, including reasonable attorneys' fees under 42

U.S.C. § 1988 and prejudgment interest;

4.    As to Count III, a money judgment against the City of Minneapolis for

compensatory damages in an amount in excess of $9,000,000, together with costs,

including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.    For an order mandating changes in the policies and procedures of the

Minneapolis Police Department requiring, among other things, policy and training

measures in the proper use of force, the proper use of restraint techniques, the proper

reporting of uses of force, and the obligation to intervene when observing the unlawful

use of force by other officers; and

6.     For such other and further relief as this Court may deem just and equitable.

**PATTY DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.**

Dated:  May 21, 2024                    **ROBINS KAPLAN LLP**

                                        s/Robert Bennett
                                        Robert Bennett, #6713
                                        Andrew J. Noel, #322118
                                        Kathryn H. Bennett, #0392087
                                        Marc E. Betinsky, #0388414
                                        Greta A. Wiessner, #0401130
                                        Julie C. Moroney, #0504300
                                        800 LaSalle Ave, Suite 2800
                                        Minneapolis, MN 55402
                                        Telephone:  612-349-8500
                                        rbennett@robinskaplan.com
                                        anoel@robinskaplan.com
                                        kbennett@robinskaplan.com
                                        mbetinsky@robinskaplan.com
                                        gwiessner@robinskaplan.com
                                        jmoroney@robinskaplan.com

                                        *Attorneys for Plaintiff Patricia Dawn Welch Day*